**VIRGIN ISLANDS TAXI ASSOCIATION, INC., Plaintiff**

**v.**

**VIRGIN ISLANDS PORT AUTHORITY, FREDDY LETTSOME, EAST END TAXI SERVICES, INC., RITZ CARLTON VIRGIN ISLANDS, INC. and CANEEL BAY RESORT, Defendants, and ST. THOMAS AND ST. JOHN HOTEL ASSOCIATION, INC., Intervenor**

Civ. No. 117/97

Territorial Court of the Virgin Islands

Div. of St. Thomas and St. John

March 10, 1997

43

RHYS HODGE, ESQ., St. Thomas, U.S.V.I., *for Plaintiff Virgin Islands Taxi Association, Inc.*

DON MILLS, ESQ., St. Thomas, U.S.V.I., *for Defendant Virgin Islands Port Authority*

WAYNE SPRAUVE, ESQ., St. Thomas, U.S.V.I., *for Defendants East End Taxi Services, Inc. and Freddy Lettsome*

SAMUEL HALL, ESQ., (Birch, de Jongh, Hindels & Hall), St. Thomas, U.S.V.I., *for Defendant Ritz Carlton Virgin Islands, Inc.*

CHARLES ENGEMAN, ESQ., (Dudley, Topper & Feuerzeig), St. Thomas, U.S.V.I., *for Defendant Caneel Bay Resort and Intervenor St. Thomas and St. John Hotel Association, Inc.*

DIASE, *Judge*

## MEMORANDUM OPINION

The Plaintiff, V. I. Taxi Association, Inc., asks the Court to enter a preliminary injunction which would (1) prohibit Defendants Freddy Lettsome, East End Taxi Services, Inc., Ritz Carlton Virgin Islands, Inc., and Caneel Bay Resort and all others similarly situated from violating its exclusive franchise granted in Act. No. 5231 to provide all ground transportation for persons departing from the Cyril E. King Airport on St. Thomas, except as specifically provided in Section 1(e); and (2) require that the Defendant V. I. Port Authority be restrained, enjoined and prohibited from permitting and facilitating others from operating any type of public

taxicab service from the Cyril E. King Airport on St. Thomas. At the center of this dispute is the constitutionality of the Act. This Court holds that Act No. 5231 is constitutional. Since the Plaintiff has fulfilled all the requirements necessary for the issuance of a preliminary injunction, the Court will enter the requested order.

## FACTS

The Virgin Island Taxi Association, Inc. ("Taxi Association") is an association of approximately 600 taxi drivers on St. Thomas and St. John. On December 29, 1986, the Legislature of the Virgin Islands, through Act No. 5231, granted it an exclusive franchise to transport all persons from the Cyril E. King Airport's ("airport") terminal except those provided in Section 1(e). The four exceptions are as follows:

> persons departing from the terminal area by foot; by a privately owned motor vehicle where no fee is charged; by a motor vehicle furnished by a concessionaire of a motor vehicle rental (drive yourself) business at the terminal facility; or by a motor vehicle owned, operated or utilized by a tour agent in the transportation of passengers traveling on a prepaid or packaged tour, which has a minimum price of $ 50 and includes either lodging or transportation on an ocean common carrier; provided that transportation from the terminal facility is part of the overall transportation arranged for in the prepaid or packaged tour.

1986 V.I. Sess. Laws 5231.

Shortly after the Act was adopted, the Taxi Association and the Virgin Islands Port Authority ("Port Authority") entered into a Taxi Concession Agreement on June 30, 1987, which established the annual and monthly fees that the Taxi Association was required to pay. Today, the franchise fee is $ 2,527.17 per month, or $ 30,326.00 annually. This franchise fee is adjusted every four years and is up for renegotiation this year. In no event, though, is the annual fee to be less than $ 22,500.00, plus any change in the Consumer Price Index.

Upon granting the exclusive franchise, and as part of the Act, the Legislature placed numerous costly requirements that the Taxi

Association had to fulfill in order to maintain this franchise and to ensure that the public's needs for transportation were met. The following are just a few of them.

First, Section 1(p) requires that it must carry and maintain public liability insurance coverage of not less than $ 250,000.00 for any one person and $ 1,000,000.00 for one accident, with the Port Authority named as the loss payee. The Taxi Association has always had this coverage, and the cost currently is $ 2,500.00 per month. Additionally, all of its drivers must carry public liability insurance coverage "of not less than $ 10,000 for any one person, $ 20,000 for any one accident and $ 10,000 for property damage in any one accident."

Second, under Sections 1(q) and (t), the Taxi Association must provide, between the hours of 7:00 a.m. to 9:00 p.m., seven days a week, not less than forty licensed taxicabs at the terminal. This requirement is to ensure that all regularly scheduled and unscheduled flights could be serviced continually and without interruption and "as the public convenience may require". In fact, Section 1(q) established that the Taxi Association could be fined if it did not provide "prompt accommodation to any person seeking transportation." And, third, Sections 1(g) and (i) provide that the Taxi Association maintain an "office room" and desk space for its traffic manager.

The Taxi Association has employed two dispatchers and had a direct telephone line installed to its office at the airport. It has diligently met, year after year, the numerous rules and regulations imposed on it by both the Legislature and the Port Authority. The total annual expense for operating at the airport is $ 67,000.00.

Being authorized to transport what was envisioned to be a large number of persons daily, the Taxi Association obviously believed that it would receive sufficient income to make the venture profitable. On the contrary, what has been happening for many months is an erosion of this franchise resulting in incalculable losses to it. Open solicitation of travelers at the terminal area by taxi drivers not affiliated with the Taxi Association as well as other taxi drivers picking up guests of hotels and various similar entities have occurred on a daily basis.

Defendant Caneel Bay Resort ("Caneel Bay") is a luxury resort on St. John. It contracts with two taxi drivers to pick up its guests

46

at the airport and either transport them to the Charlotte Amalie waterfront to take its ferry to St. John or to the Red Hook dock. These taxi drivers are not members of the Taxi Association. It charges each guest $ 50.00 for the transportation and then pays the drivers directly. The guest is free to arrange separately for his own transportation, and if he does so, Caneel Bay does not charge the $ 50.00 fee.

Defendant Ritz Carlton Virgin Islands, Inc. ("Ritz Carlton") is a luxury resort on St. Thomas located on the eastern portion of the island. It, too, usually contracts with a specific taxicab company to provide transportation for its guests from the airport to its facility. This company, however, is not a member of the Taxi Association. As with Caneel Bay, the Ritz Carlton often pays the company directly but it factors in the cost of the transportation in the overall price of the room. There have been many instances, though, in which the Ritz Carlton's representative at the airport has openly solicited the hotel's guests in the terminal area and arranged right there transportation with other non-Taxi Association members. In fact, these guests have ultimately paid a higher price for the transportation than if they had been transported by a member of the Taxi Association.[1]

Windspree Vacation Homes, a management company operated by Ms. Susan Fredrickson, manages nineteen rental villas located on St. John and is a member of the intervenor St. Thomas and St. John Hotel Association, Inc. ("Hotel Association"). It directly arranges transportation for its guests with Defendant Freddy Lettsome ("Lettsome"). Ms. Fredrickson contacts Lettsome, who is a member of and manages a portion of the taxi services for Defendant East End Taxi Services, Inc. ("East End Taxi"), and gives him the name of the guest. Lettsome arranges for one of East End's taxi drivers to pick up the guest at the airport. The driver arrives at the airport with the name and flight information of the guest, and identifies himself to the guest by carrying a sign with the

---

[1] At the hearing, evidence was submitted that a Ritz Carlton representative met its guests at the airport. This representative often told groups of four or more guests that she could obtain transportation for them to the hotel at the cost of $ 10.00 per person. The fare charged by the Taxi Association is only $ 7.00 per person.

guest's name. The guest is then transported to the Red Hook dock and pays the taxi driver directly.

Lettsome provides similar ground transportation from the airport to the Red Hook dock for guests of other vacation rental units and resorts on St. John. On a few occasions, he is contracted directly by a travel or tour agency in the continental United States to provide such transportation as part of a packaged tour. Importantly, however, he has also conspicuously solicited other travelers at the airport, and in fact, has distributed his business cards to persons disembarking from flights as they entered the terminal area.

The Hotel Association is a nonprofit corporation with 70 members, and 130 affiliated members, consisting of the large hotels to the small guest houses and bed and breakfast inns. Some of its members, like Windspree, arrange ground transportation from the airport for their guests with taxi drivers other than the Taxi Association. Others, such as Doubletree/Sapphire Beach Resort, also make arrangements for their guests, but utilize specific members of the Taxi Association. In some instances, the hotel pays the taxi driver directly, but oftentimes, the guest pays the taxi driver.

A typical scene at the airport terminal, especially after a large aircraft with many passengers has landed, is chaotic. As soon as the passengers enter the terminal area, they are confronted by various non-Taxi Association taxi drivers soliciting fares and handing out business cards. Ten to twenty members of East End Taxi hold up signs with travelers' names on them. The hotels and similar entities have other taxi drivers awaiting their guests. These non-Taxi Association members freely enter the baggage area, an area from which the Port Authority has restricted the Taxi Association members. Non-Taxi Association members cause congestion in the roadway adjacent to the terminal by parking on both sides of the curbs and otherwise blocking the free flow of traffic. Taxi Association members, though, must remain in a line outside the airport and utilize only two parking spaces near the terminal. As a result, Taxi Association members who have been waiting since 6:00 a.m. that day for a fare often do not get a fare.

Despite the Taxi Association's repeated complaints to it of the severe infractions, the Port Authority has taken an equivocal

position on enforcing the franchise. On the one hand, its executive director wrote a letter to nine hotels containing a stern warning that it was "the intent of the Virgin Islands Port Authority . . . to enforce the provisions [of the Act] to the maximum extent possible."[2] On the other hand, as the violations continued unabated, the Port Authority took no legal action to enforce the Act's provisions. It was this vacillation that ultimately forced the Taxi Association to file the instant action.

This Court entered a Temporary Restraining Order on February 13, 1997, enforcing the provisions of the Act. A hearing on the Motion for Preliminary Injunction was held on February 26 and 27, 1997.

## LEGAL DISCUSSION

Upon the Taxi Association's request for a preliminary injunction, the Court must determine whether it has established the following four requisite factors: that immediate and irreparable injury, loss or damage will occur unless the injunctive relief is granted; that there is a likelihood that it will prevail on the merits; that upon balancing the hardship on the respective parties, there will not be substantial harm to the defendants should the relief be granted; and that it is in the public's interest to order such relief. *Gladfelter v. Fairleigh Dickinson University*, 25 V.I. 91, 96 (Terr. Ct. 1990); 11A. CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, 9 FEDERAL PRACTICE AND PRODECURE §§ 2948-2948.4. (1995).

### Immediate and Irreparable Injury

■ The Taxi Association established that, due to the infringement of its exclusive franchise by the defendants and others, it and its members daily suffer incalculable economic loss. The representatives of the Taxi Association testified that its annual expenses for holding the franchise is $ 67,000.00. These operating expenses remain fixed even though there has been a significant decrease in the number of persons being transported. Its members have lost fares to innumerable others, fares from which the members pay their dues and other obligations to the Taxi Association. Even with

---

[2] Plaintiff's Exhibit 8.

these infringements and resulting losses, the Taxi Association is still required, and struggles, to comply with the conditions of the franchise, conditions which were imposed by the Legislature and accepted by the Taxi Association on the express authorization that it would exclusively provide all public taxicab services from the airport.

A plaintiff has shown irreparable harm "if that includes the impossibility of ascertaining with any accuracy the extent of the loss. That has always been included in its meaning . . . ." *Foundry Servs., Inc. v. Beneflux, Corp.*, 206 F.2d 214, 216 (Hand, J., concurring). Irreparable harm has also been found where a legal remedy would result in a multiplicity of lawsuits or if the action sought to be remedied has a constant and frequent occurrence. *Wilkerson v. Sullivan*, 727 F. Supp. 925, 936 (E.D.Pa. 1989). The Taxi Association has established immediate and irreparable harm.

## Likelihood of Prevailing on the Merits

### 1. Undue Burden on Interstate Commerce

■■ Defendants Port Authority, Caneel Bay and Ritz Carlton and the intervenor Hotel Association challenge the constitutionality of the Act.[3] In essence, they allege that the Act is an unreasonable burden on interstate commerce. They assert that the exclusive franchise held by the Taxi Association prohibits the hotels and others similarly situated from contracting with other commercial transportation services to pick up their guests.

It is well settled that "the burden of establishing the unconstitutionality of a statute rests on him who assails it . . . ." *Metropolitan Casualty Ins. Co. v. Brownell*, 294 U.S. 580, 584, 79 L. Ed. 1070, 55 S. Ct. 538 (1935). The challenging party has to overcome the presumption in favor of the constitutionality of the statute. *Davies Warehouse Co. v. Bowles*, 321 U.S. 144, 153, 88 L. Ed. 635, 64 S. Ct. 474 (1944); *Kober v. Westinghouse Electric Corp.*, 480 F.2d 240, 248 (3d Cir. 1973). Generally, "courts conceive it to be their duty to construe a statute, whenever possible, so that it may be constitutional rather

---

[3] Defendants East End Taxi and Freddy Lettsome do not challenge Act. No. 5231 as unconstitutional and, in fact, their counsel orally argued that the matter could be resolved without a determination of the constitutionality of the Act.

than unconstitutional." *Alabama State Federation of Labor v. McAdory*, 325 U.S. 450, 470, 89 L. Ed. 1725, 65 S. Ct. 1384 (1945).

The Commerce Clause of the U.S. Constitution grants to Congress the complete authority "to regulate Commerce with foreign Nations, and among the several states . . . ." U.S. CONST. art. I, § 8. It is applicable to the Virgin Islands through the Territorial Clause. *Id.* art. IV, § 3, cl. 2; *Polychrome International Corporation v. Krigger*, 5 F.3d 1522, 1534 (3d Cir. 1993); *Jackson v. West Indian Co., Ltd.*, 944 F. Supp. 423, 430 (D.V.I. 1996). The Commerce Clause protects the interstate market, not particular intrastate firms, from prohibitive or burdensome regulations. *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 127-128, 57 L. Ed. 2d 91, 98 S. Ct. 2207 (1978). A state regulation which discriminates against interstate commerce in favor of intrastate commerce unduly burdens interstate commerce. *Pa. Coach Lines v. Port Auth. of Allegheny County*, 874 F. Supp. 666, 669 (W.D. Pa. 1994). "Where the 'burden' on out-of-state interests is no different from that placed on competing in-state interests, however, it is a burden on commerce rather than a burden on *interstate commerce.*" *Norfolk Southern Corp. v. Oberly*, 822 F.2d 388, 406 (3d Cir. 1987). (emphasis in original).

The defendants contend that the Act prevents the named hotels and other similarly situated from providing certain styled transportation services for their guests. However, the defendants do not identify the interstate interests unduly discriminated against by the Act. The defendant hotels and the intervenor are all in-state interests. Nonetheless, the Act imposes a burden on interstate and intrastate interests equally. It provides who can pick up passengers, whether they be interstate or intrastate, at the airport. As such, the burden on interstate travel is nondiscriminatory.

Additionally, the Taxi Association's exclusive right to transport all persons from the airport, with certain exceptions, is a nondiscriminatory burden affecting all taxi drivers, whether they are Virgin Islands businesses or foreign. In *Jackson*, 944 F. Supp. 423, the District Court of the Virgin Islands addressed an identical right that the West Indian Company ("WICO") had granted the Taxi Association in a 1995 agreement. This agreement provided that the Taxi Association had the exclusive right to pick up all "independent" cruise-ship passengers from WICO's dock. Non-members of

the Taxi Association, however, retained the right to pick up passengers who had prepaid tours operated by various tour operators. In upholding the constitutionality of the agreement against a challenge that it violated the Commerce Clause, the court concluded that it was a nondiscriminatory "burden on all taxi cab operators regardless of whether the operators are Virgin Islands operators or non-Virgin Islands operators." *Id.* at 431.

Furthermore, at the hearing, to support their position that the Act created an "unreasonable burden", the defendant hotels and the Hotel Association described the particular type of service they seek from the taxi drivers for their guests. They stated that the taxi drivers with whom they contract drive their guests directly to the resort or other destination, and provide friendly and attentive service. They complained about the Taxi Association's members not leaving the airport until their vans are full of passengers and of the stops made in the course of a trip. They further alleged that inappropriate behavior of certain Taxi Association members may have negative effects on their businesses. They maintained that, where the guest is to stay at their facility, they (the hotels  embers of the Hotel Association) should have the right to choose who should pick up the guest at the airport.

While the Act may impact on commerce by affecting the hotels' and others' private interests, this is not sufficient to maintain a challenge based on the Commerce Clause. Moreover, testimony at the hearing established that since the Temporary Restraining Order was entered, the Taxi Association's president, Winston Parker, has been working closely with the defendant hotels and the Taxi Association's members to address the hotels' concerns and improve the delivery of taxi service. In fact, representatives of the hotels have since expressed satisfaction with the Taxi Association's service.

Importantly, such Hotel Association members as Sapphire, have had a long, satisfactory relationship with the Taxi Association and are also pleased with the services provided for its guests. The Court concludes that the private interests of the hotels and the Hotel Association's members can be adequately met by the Taxi Association.

Lastly, the hotels are permitted to have their own private or courtesy vehicles pick up their guests at the airport. Section 1(e)

provides an exception to the franchise which enables transportation by a "privately owned motor vehicle where no fee is charged." Hence, since certain hotels are concerned about the treatment of their guests enroute from the airport, this means of transportation is certainly a viable alternative.

2. *Undue Burden on Interstate Commerce Because of Impact on Interstate Traveler*

It can be argued that the Act unduly burdens interstate commerce because of its impact on the interstate traveler. Defendants Port Authority and the named hotels and intervenor Hotel Association also challenge the Act on this ground. They contend that transportation from the airport has been prearranged as part of the interstate journey and that the traveler would be unreasonably burdened by requiring him to forego it.

In *United States v. Yellow Cab*, 332 U.S. 218, 229, 91 L. Ed. 2010, 67 S. Ct. 1560 (1947), the U.S. Supreme Court held that where special arrangements have been made, as part of an interstate journey, for local transportation, such transportation is "an integral step in the interstate movement." The focus is on the character of the arrangements between the traveler and the transporter. *Port of Portland v. Bilic*, 91 Ore. App. 318, 757 P.2d 423, 427 (Or. App. 1988).

These defendants rely upon *Southerland v. St. Croix Taxicab Association*, 315 F.2d 364 (3d Cir. 1963), which applied the principles enunciated in Yellow Cab, for the proposition that it is an undue burden on interstate commerce to prevent the hotels from choosing what taxicab company will transport their guests. However, the facts in Southerland are distinguishable from this case. There, the plaintiff, a tour agent on St. Croix, had been specifically contracted by a corporation to provide its sales representatives with transportation from the Alexander Hamilton Airport in a certain type of vehicle and to carry passenger liability insurance. The corporation made the arrangements and paid the plaintiff directly for these services and special requirements. The Third Circuit Court of Appeals wrote that "to force an individual engaged in an interstate journey . . . to abandon that transportation for which he has paid and which will provide him with the type of vehicle and insurance protection he desires and employ a local taxicab operator who may

well not provide him with either is clearly to impose an unwarranted burden on the interstate commerce involved." *Id.* at 369. As such, the court held that the exclusive franchise agreement between the Government of the Virgin Islands and the St. Croix Taxicab Association violated the Commerce Clause in so far as it prohibited a tour agency from transporting passengers from the airport on a prepaid plan.

Under the instant facts, there is no direct communication between the traveler and the transporter. The hotels embers of the Hotel Association make the arrangements themselves. Also, neither in their pleadings nor in the evidence presented at the hearing did the hotels or the Hotel Association indicate that their guests specifically requested the services of East End Taxi or Lettsome or any other taxi driver. Further, they failed to establish that similar services could not be provided by the Taxi Association and its almost 600 members. To the contrary, the Taxi Association's members utilize various vehicles and have insurance coverage. Indeed, in most instances, the guest only knows that the hotel, or similar entity, will arrange transportation from the airport to the facility. In a few instances, the guest prepays this arrangement by virtue of paying a deposit for the room. Critically though, the guest simply expects to have someone meet him at the airport and take him to the facility.

The interests of the public as a whole, as expressed in the Act, for "continuous uninterrupted service" from the airport cannot be overridden by the hotels' and others' private financial interests. Southerland does not support this. Furthermore, the defendant hotels did not present any evidence that interstate travelers would have to alter their plans or would be affected in any significant way if the hotels and other members of the Hotel Association were required to arrange such transportation with the Taxi Association.

Of paramount concern to the Court is the fact that the hotels and the Hotel Association's members are complaining of the "unreasonable burden" on the traveler, when it is they themselves who have created this burden. Certainly, the principles of equity do not condone their actions.

The facts here are analogous to those in Bilic, 91 Ore. App. 318, 757 P.2d 423. United Airlines entered a contract with a transporta-

54

tion company to provide ground transportation for its flight crews between the Portland International Airport and downtown hotels. No special requirements or conditions were identified as having been imposed by United for the contract. Another company held the exclusive franchise for such transportation. While the Oregon Appellate Court noted that the flight crews were in interstate commerce, it affirmed the lower court's injunction of the United contract. The court found that the transportation company did not meet its burden of showing how the exclusive franchise unduly impeded interstate travel. Importantly, the court also noted that the service provided by the exclusive franchise "is an adequate alternative for the transportation of its crews." *Id.* at 427. *See also Executive Town & Country Services v. City of Atlanta*, 789 F.2d 1523 (11th Cir. 1986)(holding that no evidence was presented to demonstrate regulation which increased limousine fees impeded interstate travel).

This Court finds that, prior to the Temporary Restraining Order, the defendant hotels and the intervenor Hotel Association did not inform the Taxi Association of their concerns with its services. As set forth previously, the defendant hotels and the Taxi Association have worked together since to provide Virgin Islands visitors with adequate ground transportation from the airport. The president of the Taxi Association has pledged to continue to work with the hotels and the Hotel Association in this regard.

In upholding the exclusive franchise, the court in Bilic emphasized that the transportation company's position, if accepted by the court, "would allow various commercial transportation providers to define the scope of their activity and thus to be outside the . . . regulatory authority." *Id.* at 426. Also, "the lucrative part of the transportation market would be carved into a number of separate contracts, leaving other uneconomic transportation services wanting for a provider." *Id.*

Similarly, here, prior to the Temporary Restraining Order, the defendants determined the scope of their activity. As a result, a circus-like atmosphere existed at the airport. Since the Temporary Restraining Order was entered, though, the Taxi Association has been able to organize and arrange transportation in an orderly fashion.

55

Additionally, for this Court to accept the defendants' position would be to permit the transportation market from the airport to be significantly altered and fractured. All the hundreds of hotels, guest houses, and similar facilities would be free to contract with whom they pleased to pick up guests at the airport. The intent of the Legislature to have accessible transportation for the entire public would be frustrated and it would be questionable as to what transportation would inevitably be available. Various representatives of the Taxi Association have already testified that the airport venture has been a financial strain on its resources due to the intrusion of innumerable other taxi drivers. Without the Taxi Association's services, other air travelers would be at the whim of whatever commercial transportation providers are available.

Specifically, in regard to Lettsome, certain of his transportation services are permissible under an exception to the franchise. As stated earlier, he testified that, on some occasions, he is contacted directly by a tour or travel agent on the United States mainland who arranges for him to pick up passengers at the airport as part of a prepaid or packaged tour. When he is performing such services, Lettsome is providing a motor vehicle utilized by a tour or travel agent for the transportation of passengers as part of the tour. He, therefore, can continue to pick up such passengers at the airport, upon showing the appropriate documentation.

Thus, the Court finds that the Act is constitutional. And, as violations were established, the Taxi Association would prevail on the merits.

## Substantial Harm to Defendants

■ As to the resulting harm to the defendants upon the granting of the preliminary injunction, the Court finds it would not be substantial and, in fact, negligible. The Taxi Association stands ready to work with the hotels and the Hotel Association to provide all guests with the quality service that is demanded and expected. The working partnership between the defendant hotels and the Taxi Association which has resulted since the Temporary Restraining Order was issued is a strong testament to this. The hotels have complimented the Taxi Association for its high level of services during this period. The president of the Taxi Association has

strongly pledged to provide the hotels with only the best quality drivers and, in fact, testified that he had already ordered certain drivers suspended when he received complaints from the affected hotels. The hotels and members of the Hotel Association will still be able to provide their guests with the efficient taxi transportation that is required while working within the confines of the Act.

**Public Interest**

■ The franchise awarded to the Taxi Association serves all air travelers to the airport. Thus, while the hotel guests might constitute the larger percentage of such travelers, the needs of the general public require that a source of transportation from the airport be readily available. This was the public policy concern articulated by the Legislature in granting the franchise to the Taxi Association. Public interest demands that such service be maintained.

■ Finally, the defendants have attempted to justify their position by arguing that the Taxi Association is charging exorbitant rates for the transportation of persons from the airport. Pursuant to 20 V.I.C. §§ 404(a) and 402(h), the Virgin Islands Taxicab Commission is empowered to fix the maximum rates to be collected for motor vehicles operated for hire. According to 20 V.I.C. § 402(g), the Taxicab Commission is authorized to impose fines and penalties for a violation of the rate schedule. Neither the defendants nor their witnesses testified that they had ever filed complaints with the Taxicab Commission or that the administrative remedy had been exhausted. As such, based on the record before it, the Court lacks subject matter jurisdiction over the issue of the improper fees allegedly charged.

## CONCLUSION

In conclusion, the Court finds that Act No. 5231 is constitutional. Furthermore, upon consideration of the relevant factors, the Court finds that the Taxi Association has met its burden for the issuance of a preliminary injunction prohibiting the defendants Virgin Islands Port Authority, Freddy Lettsome, East End Taxi Services, Inc., Ritz Carlton Virgin Islands, Inc., and Caneel Bay Resort and all others similarly situated from violating the exclusive franchise

granted by the Act to the Taxi Association to provide all public taxicab service for persons leaving the Cyril E. King Airport terminal, except as specifically provided in Section 1(e) of the Act. An appropriate Order shall be entered.

DATED this 10th day of March, 1997

## ORDER

A Memorandum Opinion having been entered on even date, it is hereby

ORDERED that Act No. 5231, approved December 29, 1986, is declared to be constitutional; and it is

ORDERED that the Plaintiff Virgin Islands Taxi Association, Inc.'s Motion for a Preliminary Injunction is GRANTED against the Defendants Virgin Islands Port Authority, Freddy Lettsome, East End Taxi Services, Inc., Ritz Carlton Virgin Islands, Inc., and Caneel Bay Resort; and it is

ORDERED that the Defendant Virgin Islands Port Authority and its officers, agents, servants, employees, attorneys, assignees, successors in interest and all persons acting in consort or participating with them, are restrained, enjoined and prohibited from permitting and facilitating others that the Virgin Islands Taxi Association, Inc. and those identified in Section 1, subsection (e) of Act No. 5231 from operating public taxicab service from the Cyril E. King Airport, St. Thomas; and it is further

ORDERED that the Defendants Freddy Lettsome, East End Taxi Services, Inc., Ritz Carlton Virgin Islands, Inc., Caneel Bay Resort and all others similarly situated and their officers, agents, servants, employees, attorneys, assignees, successors in interest and all persons acting in consort or participating with them, are restrained, enjoined and prohibited from operating public taxicab service from the Cyril E. King Airport, St. Thomas, except as provided in Act No. 5231, Section 1, subsection (e); and it is further

ORDERED that a copy of this Order be directed to Rhys Hodge, Esq.; Don Mills, Esq.; Charles Engeman, Esq.; and Wayne Sprauve, Esq.